MICHAEL L. TUCHIN (CA State Bar No. 150375)
    *Verified Petition Pending*
MARTIN R. BARASH (CA State Bar No. 162314)
    *Verified Petition Pending*
COURTNEY E. POZMANTIER (CA State Bar No. 242103)
    *Verified Petition Pending*
KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067
Telephone:   (310) 407-4000
Facsimile:    (310) 407-9090
Emails:    mtuchin@ktbslaw.com
                mbarash@ktbslaw.com
                cpozmantier@ktbslaw.com

Proposed Reorganization Counsel for the
Debtor and Debtor in Possession

ROBERT M. CHARLES, JR. (NV Bar No. 6593)
DAWN M. CICA (NV Bar No. 4565)
LEWIS AND ROCA LLP
3993 Howard Hughes Pkwy., Suite 600
Las Vegas, NV  89169
Telephone:   (702) 949-8200
Facsimile:    (702) 949-8398
Emails:    rcharles@lrlaw.com
                dcica@lrlaw.com

Proposed Reorganization Co-Counsel for the
Debtor and Debtor in Possession

*Left margin:* KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No.:  11- |
| NEVADA CANCER INSTITUTE, a Nevada nonprofit corporation,[1] | Chapter 11 |
| Debtor. | **DECLARATION OF GEORGE D. PILLARI IN SUPPORT OF FIRST DAY MOTIONS** |

I, George D. Pillari, declare as follows:

## I.

## QUALIFICATIONS OF DECLARANT

1.      I am over eighteen years of age.  I am the Chief Restructuring Officer ("CRO") for Nevada Cancer Institute, a Nevada nonprofit corporation (the "Debtor").  I was appointed CRO by the Debtor's board of directors ("Board"), effective as of the date of the Debtor's chapter 11 filing

---

[1]    The Debtor's address and last four digits of its Federal Tax I.D. are:  One Breakthrough Way, Las Vegas, NV 89135 [EIN XX-XXX2553].

134136.16

(the "Petition Date").  From March 2011 to the Petition Date, I served as an advisor to the Debtor in connection with its operational and financial restructuring efforts.

2.        I have over 25 years of experience in the healthcare industry.  For the past five years, I have been a Managing Director with Alvarez & Marsal Healthcare Industry Group, LLC ("A&M"), a global professional services firm specializing in turnaround and interim management, performance improvement, and restructuring services.  I have worked as an advisor and officer for hospital systems, clinical laboratories, and managed care and other healthcare organizations, including as the chief operations advisor to Santa Clara Valley Health & Hospital System and the chief restructuring advisor to the Community Health Network of Washington.  Approximately one-half dozen of the entities that I have advised or managed over the last five years were chapter 11 debtors at some point during my engagement with them.

3.        Prior to joining A&M, I founded and managed several businesses in the healthcare industry.  In 2004, I founded Copay Solutions, LLC, which managed consumer healthcare finances.  Copay Solutions was acquired by Health CPA in 2007.  In 2000, I founded CBCA and thereafter served as its chairman and chief executive officer.  CBCA is a health benefits outsourcing company that managed more than $1 billion of medical costs annually on behalf of corporate customers.  CBCA was acquired in 2005 by CareGuide, a publicly traded disease management company.  From 1999 to 2000, I served as an entrepreneur in residence at Trident Capital and ABS Ventures, which are venture capital and private equity firms.

4.        In 1985, I co-founded and served as chairman and chief executive officer of a company now known as Solucient, which provided the hospital, insurance, and pharmaceutical industries with database, software, and analytical services used to benchmark clinical performance and outcomes, and to manage the cost and delivery of healthcare.  I led that company from its start-up phase through its initial public offering and managed it as a public company until its acquisition.

5.        I hold a Bachelor of Science degree from The Johns Hopkins University. Following my graduation from Johns Hopkins, I was employed as a research analyst by The Johns Hopkins Center for Healthcare Finance and Management.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

6.      As an advisor to the Debtor for over seven months, I have become very familiar with the Debtor's operations, including its research activities, business and financial affairs, human resources and other management activities.  Additionally, I have served as the principal business contact for the Debtor in negotiations and communications with the Debtor's lenders and other creditors, assisted in the analysis of financial performance and the projection of future performance of the Debtor, and have advised the Board regarding the Debtor's restructuring options.

7.      In the ordinary course of my work for the Debtor, I have worked with and relied upon the books and records of the Debtor (and will continue to do so), including operational reports, financial statements, patient records, correspondence, legal documents, and other business records that are prepared by the Debtor's staff, communicated to the Debtor, and obtained by the Debtor in the ordinary course of its business.

8.      I am familiar with: (i) the Debtor's books and records, which are now under my supervision and control as CRO; (ii) the Debtor's business and financial affairs; and (iii) the business of providing medical services.

9.      If called as a witness, I could and would competently testify to the matters set forth herein from my own personal knowledge, including the knowledge that I have derived from my review of books and records of the Debtor.

## II.

## BACKGROUND

### A.      Overview of NVCI.

10.      Founded in 2002, the Debtor is a nonprofit cancer institute committed to advancing the frontiers of knowledge of cancer through research, enabling affiliated physicians to provide world-class, research-linked clinical cancer services to patients, facilitating outreach and education programs aimed at raising cancer awareness, and reducing the burden of cancer on the people of Nevada.  The Debtor has been designated by the State of Nevada as the State's official cancer institute, and is qualified as a nonprofit organization under section 501(c)(3) of the Internal Revenue Code.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

11.     The Debtor maintains a state-of-the-art outpatient cancer treatment and research facility in the Summerlin area of Las Vegas (the "Flagship Building") and provides comprehensive management services to physicians employed by the non-debtor oncology medical group, Ruckdeschel Manno, Ltd. dba Nevada Cancer Institute Medical Group (the "Medical Group," and together with the Debtor, "NVCI"). The Flagship Building is located near the intersection of Clark County Route 215 and Town Center Drive.

12.     NVCI provides professional medical services, infusion therapy, radiation therapy, diagnostic imaging, and related ancillary services, at the Flagship Building and at leased premises located at the University Medical Center in central Las Vegas ("UMC"). The Flagship Building houses its own diagnostic equipment including PET, CT, MRI, and digital mammography, and provides a place for patients to obtain psychosocial and nutrition counseling, participate in a survivorship clinic, and obtain pain management services.

13.     NVCI employs approximately 150 physicians, researchers, nurses and other personnel. During the first six months of 2011, NVCI conducted approximately 22,600 discrete patient visits, which included approximately 1,010 new patient consultations, approximately 1,450 mammogram studies, and approximately 5,150 radiation and chemotherapy infusion treatments. Currently, approximately 5,200 patients are receiving some kind of care from NVCI.

14.     In August 2011, NVCI earned the Gold Seal of Approval™ from The Joint Commission, an accreditation that NVCI first earned in 2008. The Joint Commission, a nonprofit entity founded in 1951, is the nation's oldest and largest standards-setting and accrediting body in healthcare. The Joint Commission accreditation process involves an examination of all components of a healthcare institution's operations, examining everything from patient care, to communication, to record keeping. This three-year accreditation reflects both NVCI's satisfaction of the Joint Commission's rigorous quality and safety standards and its commitment to continual compliance with those standards.

15.     In addition to providing a center for high quality patient care, the Flagship Building is home to ongoing scientific research activities into the causes, prevention, and treatment of cancer. One aspect of these research activities involves laboratory research, which has resulted in

a variety of adult stem cell and biomarker-related discoveries, although none has yet been commercialized.  Another aspect of these research activities involves the participation of patients treated  in clinical drug trials.  These clinical trials, and prior studies, have made novel drugs available to Nevadans suffering from cancer that otherwise would not have been available to them.  Since its inception, NVCI has opened to enrollment a total of 176 trials, including 13 first in human trials where patients from other states and countries traveled to NVCI to participate.  As of December 1, 2011, there are 16 trials open to new enrollment, and another 39 trials that are closed to new enrollment but open for purposes of patient follow up.

16.    Inside and outside the Flagship Building, NVCI personnel are actively involved in collaborative efforts with other Nevada institutions to improve cancer care in Nevada by, among other things, creating and facilitating an Oncology Fellowship with the University of Nevada School of Medicine, teaching medical school residents at the University Medical Center, conducting joint research with faculty from the University of Nevada, Las Vegas and the University of Nevada, Reno; and conducting a program with the College of Southern Nevada to include oncology training as part of the nursing curriculum.

17.    The Debtor also conducts educational programs and outreach throughout Nevada at schools, workplaces, community centers, senior centers, faith-based organizations, union halls, community activities, health fairs and support group meetings, organizes and trains "patient navigators" to help arrange treatment and follow up care, and provide referrals to community resources, and maintains a mobile diagnostic unit or "Hope Coach" that brings digital mammography directly to Nevadans, including those who live in rural areas without nearby access to mammograms.  Through these efforts, and others, the Debtor has provided valuable information, support, diagnosis and education to thousands of Nevadans.

18.    As required by law, NVCI maintains a policy regarding the privacy and use of patient healthcare information and other personally identifiable information (the "Privacy Policy") and a "Notice of Privacy Practices" (the "NPP").  The NPP is posted, in among other locations, on NVCI's website and in the Flagship Building.  True and correct copies of the NPP and the Privacy Policy, in effect as of the Petition Date, are collectively attached hereto as Exhibit 1.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

**B.    Corporate Structure.**

19.    The Debtor is a Nevada nonprofit corporation.  It has no members or equity holders.  The Debtor is governed by the Board, which is comprised of 11 distinguished business and medical professionals, who volunteer their service without compensation.  The chairman of the Board is Michael Yackira, who is president and chief executive officer of NV Energy, Inc., a holding company that owns Nevada Power Company and Sierra Pacific Power Company.  The Debtor currently does not have a chief executive officer or chief operating officer.

20.    There are seven physicians employed by the Medical Group, which is not a debtor. The Medical Group is a Nevada professional corporation, whose stated purpose (according to its amended and restated articles of incorporation) is to "provide medical services to support Nevada Cancer Institute [and its] mission . . . ."  The physicians employed by the Medical Group do not hold any equity interest in the Medical Group.

21.    The shares of the Medical Group are held by Dr. Ikram U. Khan and Dr. Javaid Anwar, two distinguished physicians who are licensed to practice medicine in the State of Nevada and who are members of the Board of the Debtor.  Dr. Khan serves as one of two members of the board of directors for the Medical Group, and as president, secretary and treasurer for the Medical Group.  Dr. Anwar is the other member of the board of directors for the Medical Group and vice president of the Medical Group.  Dr. Khan and Dr. Anwar have not and will not receive any distributions, dividends or compensation on account of the various positions they hold with the Medical Group.

22.    Dr. Khan has more than 30 years of experience as a surgeon.  Dr. Khan is the President of Quality Care Consultants, LLC, which provides guidance and support to employers, health insurers and hospitals in the areas of health care policy, strategy, and quality improvement initiatives.  Dr. Khan also serves as a member of the Board of Regents for the Uniformed Services University of Health Sciences in Betheseda, Maryland (an appointment made by the President of the United States and confirmed by the United States Senate), the Nevada Governor's Commission for Medical Education, Research and Training, and other governmental and quasi-governmental health care-related advisory boards.

134136.16

6

23.     Dr. Anwar is chief executive officer of Quality Care Consultants, LLC, which provides guidance and support to employers, health insurers and hospitals in the areas of health care policy, strategy, and quality improvement initiatives.  Dr. Anwar was appointed as a member to the State Board of Medical Examiners in 2003 by then Governor Kenny Guinn and was elected president of the Nevada State Board of Medical Examiners in 2005.  Dr. Anwar was awarded the Clark County Medical Society President's Award and was named among America's Top Physicians 2007 by Consumer's Research Council of America.  Since 2007, Dr. Anwar has served as a member of the board of trustees of the Harry S Truman Scholarship Foundation (Public), pursuant to appointments by President George W. Bush.

24.     The Debtor does not hold an equity interest in the Medical Group, but the activities of the two entities are closely coordinated.  All of the managed care contracts for services provided to patients at the Flagship Building and the UMC location are between managed care payor entities and the Medical Group.  Likewise, the Medical Group holds a Medicare provider number.  The Debtor is not a party to any payor contracts.  The Debtor recently obtained a Medicare Provider number, but has not billed any amounts under that number.

25.     Nevertheless, pursuant to a long-established practice, the Medical Group regularly transfers to the Debtor one-hundred percent of the revenues collected from those managed care contracts and received from Medicare.  In turn, the Debtor pays the compensation of, and provides benefits to, the physicians employed by the Medical Group, and handles all billing, administration and management related to patient services provided by those physicians.  This longstanding practice, which both the Debtor and the Medical Group intend to continue postpetition, has been memorialized in that certain Management Services Agreement dated as of November 2, 2011.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

C.     **The Debtor's Capital Structure.**

26.     The Debtor's unaudited balance sheet as of September 30, 2011 shows, on a book value basis, the following approximate amounts: assets of $173.6 million, liabilities of $98.9 million, and net assets of $80 million.[2]

27.     The balance sheet reflects the following assets, on a book value basis, in the following approximate amounts: (i) real property of $138 million; (ii) assets limited as to use of $20.4 million; (iii) pledge receivables of $18.87 million; (iv) clinical accounts receivable (net of doubtful accounts) of $3.0 million; (v) equipment of $10.7 million; (vi) grant and other receivables of $1.3 million; (vii) inventories of $468,000; and (viii) cash of $2.1 million.

28.     The balance sheet reflects the following liabilities, on a book value basis, in the following approximate amounts:  (i) $91 million in secured debt; (ii) accounts payable of $5.1 million; (iii) other accrued liabilities of $2.0 million; (iv) current lease payments due of $783,000; and (v) other long-term debt of $3.7 million.

29.     The following paragraphs provide greater detail on the Debtor's liabilities and its assets as of shortly before the commencement of its bankruptcy case.

D.     **Secured Debt.**

1.     **The Credit Facility.**

30.     The Debtor  is the borrower under that certain Amended and Restated Credit and Reimbursement Agreement, dated as of April 23, 2008 among the Debtor, Bank of America, N.A. as Administrative Agent ("Bank of America" or the "Agent"), JPMorgan Chase Bank, National Association as Syndication Agent, Bank of Scotland PLC and UBS Loan Finance LLC, as Co-Documentation Agents and other lenders party thereto (as amended or modified, the "Credit Agreement").

31.     The Credit Agreement amended and restated the then-existing credit agreement (dated as of December 1, 2003), under which Bank of America, on behalf of the lenders

---

[2]     Based on information available to me, the book value of the assets does not reflect the market value of such assets.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

thereunder (the "Lenders"), had issued a letter of credit ("Letter of Credit") to support $50 million in principal amount of public bonds issued by the State of Nevada to fund the construction of the Flagship Building (the "Public Bonds"). In connection with that amendment and restatement, the Lenders agreed to provide an additional $100 million in credit facilities, consisting of $85 million under a construction facility and $15 million under a revolving facility.

32.     As of the commencement of the Debtor's case, the principal balance under the Credit Agreement was approximately $91 million, comprised of approximately $44.4 million in reimbursement obligations in respect of the Letter of Credit (which was drawn in April 2011) and approximately $46.6 million in respect of the construction facility. There were no loans made under the revolving facility and there are no amounts outstanding thereunder. The maturity date under the Credit Agreement was April 23, 2011. As of that date, the Debtor had not reimbursed the Lenders on account of the Letter of Credit draw or repaid the other amounts due under the Credit Agreement.

33.     In conjunction with the Credit Agreement, the Debtor entered into the Amended and Restated Construction Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing ("BofA Deed of Trust") and Security Agreement ("BofA Security Agreement"), both dated April 23, 2008. The BofA Deed of Trust grants a lien in favor of Bank of America, as Agent, to secure the indebtedness under the Credit Agreement (the "Bank Debt"), against certain Las Vegas real estate that is owned by the Debtor, including any rents generated from that real estate, and all fixtures thereto.

34.     The encumbered real estate is comprised of the following, which are described in greater detail below: (i) the Flagship Building and the land on which it is situated (Clark County APN 164-13-712-010),[3] (ii) the Ralph and Betty Engelstad Cancer Research Building and the land on which it is situated (Clark County APN 164-13-618-001) (the "Research Building"), and (iii)

---

[3]    Hereinafter, the term "Flagship Building" collectively refers both the building and the real property on which it is situated.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1  certain vacant land adjacent to the Flagship Building (Clark County APN 164-13-712-015) (the

2  "Vacant Land").

3      35.    The Security Agreement grants a lien in favor of Bank of America, as Agent, to

4  secure the indebtedness under the Credit Agreement, against substantially all of the Debtor's

5  personal property, including cash, accounts receivable, and a certain cash collateral account

6  established to provide additional collateral to the Lenders in respect of the Credit Agreement (the

7  "Cash Collateral Account").  As of the commencement of the Debtor's case, the balance of the

8  Cash Collateral Account was approximately $2.8 million.  Pursuant to a cash collateral stipulation

9  negotiated between the Debtor and the Lenders, a substantial portion of the remaining funds will

10  be used to fund operations and administrative expenses during the pendency of this case.[4]

11                     **2.    Administration Building Parcel Loan.**

12      36.    In 2007, the Debtor borrowed approximately $3.7 million ("Administration

13  Building Parcel Loan") from NCI Admin Bldg., LLC ("NAB") to acquire a fourth parcel of

14  Summerlin real estate (Clark County APN 164-13-712-020) (the "Administration Building

15  Parcel"), which serves as security for that loan under a deed of trust in favor of NAB (the "NAB

16  Deed of Trust").  NAB is an affiliate of The Greenspun Corporation, a Las Vegas-based real estate

17  development company.  The Greenspun family and the Greenspun Family Foundation, which I

18  understand are related to that entity, have in the past provided philanthropic support to the Debtor.

19  As discussed further below in Paragraph 55, the Debtor owns the Administration Building Parcel,

20  but not the administration building itself or the adjacent parking structure constructed on that

21  parcel.  As of the Petition Date, the outstanding balance of the Administration Building Parcel

22  Loan was approximately $3.7 million.

23

24

25

26  [4]    As discussed in greater detail below, see Paragraphs 67-69, certain funds that were previously
          on deposit in the Cash Collateral Account were consensually released by the Agent and
27        Lenders prepetition, in order to permit the Debtor to continue operating and to reduce debt
          under the Credit Agreement.
28

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

### 3. Oncology Supply.

37.     Oncology Supply is the Debtor's principal provider of oncology medication. Oncology Supply and the Debtor are parties to a certain Application for New Account, the terms and conditions of which include the grant of a security interest on substantially all of the Debtor's personal property to secure the Debtor's "existing and future liabilities to Oncology Supply." There is a UCC-1 financing statement on file with the Nevada Secretary of State asserting a security interest in "all assets" of the Debtor, which financing statement appears to have been filed on October 5, 2009.  Oncology Supply does not have a control agreement or otherwise exercise control over any of the Debtor's deposit accounts.  As of the Petition Date, the Debtor estimates that it owes Oncology Supply approximately $500,000, a substantial portion of which is on account of goods delivered within 20 days of the commencement of the case.  The Budget provides for Oncology Supply to be paid in full during this chapter 11 case.

### 4. Unsecured Debt.

38.     As of shortly before the Petition Date, the Debtor had unsecured accounts payable due and owing in respect of goods and services utilized in the ordinary course of its business of approximately $5.5 million.[5]  In addition, as of the Petition Date, the Debtor: (a) had unsecured obligations in respect of prepetition employee compensation, related payroll taxes and accrued obligations under certain of its employee benefit programs, as described in Paragraphs 96 - 136 below, (b) had pending against it litigation by certain former employees of NVCI asserting claims against the Debtor, and (c) had certain contingent and/or unmatured obligations under executory contracts and unexpired leases.

39.     Although the Debtor is not aware of any amounts outstanding thereunder, the Debtor  is a party to a certain Finance Agreement and Promissory Note dated as of December 23, 2003, pursuant to which the Debtor borrowed $50 million from the Director of the State of Nevada Department of Business and Industry, representing the proceeds of the public bonds issued to fund

---

[5]   Claims that are not related to goods and services utilized in the ordinary course of business, such as the Lenders' deficiency claim, are not included in this approximate amount.

1    construction of the Flagship Building.  As noted above, it is my understanding that the indenture

2    trustee for the Public Bonds made a draw on the Letter of Credit in April 2011, to satisfy the debt

3    outstanding under the Public Bonds.  On or about April 15, 2011, Bank of America invoiced the

4    Debtor in respect of its obligation to reimburse the Lenders for that draw.

5        **E.    Assets.**

6            **1.    Unrestricted Cash.**

7        40.    As of shortly before the commencement of the Debtor's case, the Debtor had

8    approximately $226,742 in "Unrestricted Cash" on deposit.  Unrestricted Cash comprises

9    revenues, charitable donations that are not held in trust or otherwise subject to restrictions that

10   would prevent such funds from being used to fund the Debtor's operations, and funds released

11   from the Cash Collateral Account by the Agent for use in operations.  Unrestricted cash does not

12   include the funds presently on deposit in the Cash Collateral Account, the Engelstad Endowment

13   Fund, the Patient Cares Committee Fund, the Saffer Endowment Fund, and the Other Donor-

14   Restricted Funds, which terms are defined and described below (to the extent not defined above).

15           **2.    Restricted Cash/Trust Funds.**

16               **a.    Cash Collateral Account.**

17       41.    As noted, the balance of the Cash Collateral Account as of shortly before the

18   commencement of this case was approximately $2.8 million.

19               **b.    Engelstad Endowment Fund.**

20       42.    Subject to the terms of that certain agreement dated January 4, 2007 between the

21   Debtor and the Engelstad Family Foundation (the "Gift Agreement"), until shortly before the

22   Petition Date, the Debtor had possession of a $15 million endowment fund (the "Engelstad

23   Endowment Fund").  Pursuant to the Gift Agreement, the Debtor is authorized to use the interest

24   generated by the principal in the Engelstad Endowment Fund only to support lung cancer research-

25   related purposes, but is not authorized to use the principal.  If the interest cannot be used for

26   specified charitable purposes, the Gift Agreement provides that the Engelstad Endowment Fund

27   and all income earned thereon reverts to the Engelstad Family Foundation, for such other

28

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

charitable purposes as the Engelstad Family Foundation may, in its sole discretion, determine and direct.

43.    As discussed in greater detail in Paragraphs 79 through 81, the Gift Agreement was modified as of November 15, 2011 by that certain First Amendment to Gift Agreement ("Gift Amendment") and the Engelstad Endowment Fund thereafter transferred to an escrow in accordance with the Gift Agreement.  As discussed in those paragraphs, the Engelstad Family Foundation has agreed that the funds comprising the Engelstad Endowment Fund will serve as financial backstop of a substantial portion of the philanthropic commitment of the Debtor that is required in connection with the proposed sale of assets.

### c.    Patient Cares Committee Fund.

44.    The Debtor  has possession of approximately $176,711 in donor-restricted funds comprising the "Patient Cares Committee Fund."  These funds were solicited and donated for the express charitable purpose of providing financial aid to Nevada cancer patients in need.  Among other things, these funds have been used in the past to fund insurance premiums, COBRA payments, and treatment-related transportation costs for patients that are in need of cancer treatment, but have little or no means to pay expenses due to their employment and/or financial status.  The funds comprising the Patient Cares Committee Fund are maintained in a segregated bank account as charitable trust funds.[6]

### d.    The Saffer Endowment Fund.

45.    The Debtor has possession of approximately $350,000 pursuant to a certain Gift Agreement executed in December 2008 ("Saffer Endowment Agreement") establishing The Sandra and Morton Saffer Cancer Research Endowment Fund (the "Saffer Endowment Fund"). Pursuant to the Saffer Endowment Agreement, the Debtor is permitted to use the net investment income from this fund for specified cancer research purposes.  The Saffer Endowment Agreement provides that if the Debtor ceases to fund or pursue cancer research, the funds comprising the

---

[6]    The Debtor does not intend to close and replace this account because it holds charitable trust funds exclusively (rather than property of the estate).

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

Saffer Endowment Fund shall be transferred to another entity that delivers cancer research as its primary objective. The funds comprising the Saffer Endowment Fund are maintained in a segregated back account as charitable trust funds.[7]

### e.    Other Donor-Restricted Funds.

46.    In addition to the foregoing, the Debtor is holding approximately $1.7 million in other donor-restricted funds ("Other Donor-Restricted Funds"). These funds constitute charitable donations, grants, scholarships and other funds that are subject to donor-imposed restrictions on their use. These restricted charitable funds were transferred to the Debtor, subject to these restrictions, by approximately 30 different entities, virtually all of which are charitable foundations. The Other Donor-Restricted Funds, which have been treated by the Debtor as charitable trust funds, are on deposit in a segregated bank account.[8]

### 3.    Real Estate.

47.    The Debtor owns real property, some of which is described above. The following is a complete list of the Debtor's real estate holdings.

### a.    The Flagship Building.

48.    The Flagship Building comprises a 142,000 square foot structure situated on a 5.67 acre lot located at One Breakthrough Way, Las Vegas, NV 89135. The Debtor owns both the land and the building. The building was designed and outfitted for the diagnosis and treatment of cancer patients on an outpatient basis and related research activities. The Flagship Building is home to a medical oncology suite, a radiation oncology suite, a pathology lab, research laboratories, a 24-seat chemotherapy suite, a cafeteria, a library, administrative space, and a specialty boutique aimed at the needs and comfort of cancer patients. The Flagship Building is

---

[7]    The Debtor does not intend to close and replace this account because it holds charitable trust funds exclusively (rather than property of the estate). Until shortly before the Petition Date, a portion of the Engelstad Endowment Fund also was maintained in this account.

[8]    The Debtor does not intend to close and replace this account because it holds charitable trust funds exclusively (rather than property of the estate).

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1    subject to the BofA Deed of Trust.  The Flagship Building was custom-built to house the

2    foregoing facilities and is not suited for purposes other than cancer treatment and research.

3        49.    The Debtor purchased the underlying parcel from Howard Hughes Properties, Inc.

4    ("HHP") in 2003.  It is my understanding that the real property is subject to a variety of covenants,

5    conditions and restrictions regarding use of the real estate.  These include restrictions granted for

6    the respective benefit of each of HHP and the UHS Holding Company, Inc. ("UHS").  UHS is

7    affiliated with Universal Health Services, Inc., a subsidiary of which owns and operates

8    Summerlin Hospital Medical Center.  My understanding is that HHP and/or UHS assert that use of

9    this real estate is limited by those restrictions to that of a nonprofit cancer treatment and research

10    center, and UHS asserts that the real property may not be utilized for in-patient care.

### b.    The Research Building.

12        50.    The Research Building comprises a 184,000 square foot structure situated on a 5.09

13    acre lot located at 10530 Discovery Drive, Las Vegas, NV 89135.  The Debtor owns both the land

14    and the building.  The three-story structure with a full basement contains 24 biosafety level (BSL)-

15    2 laboratories.  One floor of the Research Building has not yet been built out.

16        51.    The Research Building is named in honor of Ralph and Betty Engelstad, in

17    recognition of a $20 million gift from the Engelstad Family Foundation (of which $15 million has

18    been funded to date).  Mr. Engelstad, the long-time owner of the Imperial Palace, died of lung

19    cancer in 2002.

20        52.    On or before May 18, 2011, most of the Debtor's research activities were moved to

21    the Flagship Building.  The Debtor maintains an x-ray diffractometer and electron microscope in

22    the Research Building and has been using that equipment in connection with the Debtor's research

23    operations, as needed.  The Debtor also maintains certain information technology backup systems

24    on the premises.

25        53.    My understanding is that HHP and/or UHS assert that use of this real estate is

26    limited to research and UHS asserts that the real property may not be utilized for in-patient care.

27    The Research Building is subject to the BofA Deed of Trust.

28

134136.16

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

### c.    The Vacant Land.

54.    The Vacant Land, which is adjacent to the Flagship Building, comprises 9.24 acres that was purchased from HHP in 2005.  My understanding is that HHP and/or UHS assert that use of this real estate is limited in the same manner as the Flagship Building.  The Vacant Land also is subject to the BofA Deed of Trust.

### d.    Administration Building Parcel.

55.    As noted, the Debtor owns the Administration Building Parcel, but not the structures situated on that land.  The Debtor's acquisition of the Administration Building Parcel was part of a related series of transactions in which: (i) the Debtor leased the Administration Building Parcel to NAB, (ii) NAB agreed to construct a three-story administrative services building  ("Administration Building") and 500-space parking structure ("Parking Structure") on that parcel, and (iii) the parties agreed that the Debtor would lease a substantial portion of the Administration Building and Parking Structure ("Administration Building Lease").

56.    Pursuant to these agreements, NAB constructed and currently owns the Administration Building and Parking Structure.  In order to finance the construction, NAB obtained a loan from Wells Fargo Bank, N.A. ("Wells Fargo") in an original principal amount of $30 million.  In connection with that transaction, Wells Fargo obtained a deed of trust against the Administration Building Parcel ("Wells Fargo Deed of Trust") and a subordination of the NAB Deed of Trust against that parcel.  Wells Fargo also took an assignment of rents from NAB under the Administration Building Lease.

57.    My understanding is that HHP asserts that use of this real estate is limited to that of a commercial office building, of which 60% of leasable space is to be occupied by the Debtor for administrative use and only 40% by third parties, and that UHS asserts no more than 20% of the leasable space may be used for medical purposes.

58.    Pursuant to the Administration Building Lease, the Debtor previously occupied a portion of the Administration Building to house staff members from a variety of administrative departments, including Communications, Development, Finance, Human Resources and Information Technology.

59.    On or about April 19, 2011, American Nevada Realty, an affiliate of NAB, served a certain "Five (5) Day Notice to Quit or Pay Rent," asserting that $144,732.33 was in default under the Administration Building Lease and demanded payment.  The Debtor did not pay that amount and has not paid any amount to NAB since then.

60.    On or before May 18, 2011, the Debtor moved its personnel out of the Administration Building, surrendered possession of the Administration Building, and consolidated its operations into the Flagship Building.  The Debtor no longer occupies any part of the Administration Building.  I am informed and believe that the space previously occupied by the Debtor has not been relet to another tenant.

61.    Now that the Debtor has commenced this chapter 11 case, it intends to promptly reject the Administration Building Lease under the Bankruptcy Code.

### e.    Alta-Hualapai Parcel.

62.    Pursuant to an act of Congress — Section 2603 of the Omnibus Public Land Management Act of 2009 ("Act") — the United States, through the Bureau of Land Management, granted to the Debtor approximately 19 acres of undeveloped land near the intersection of Alta Drive and Hualapai Road, in the City of Las Vegas, for the development of a nonprofit cancer institute (the "Alta-Hualapai Parcel").  My understanding is that this parcel is subject to reversion to the United States if (i) it is not owned by the Debtor, or (ii) is not used for this specified purpose.  At this time, the Alta-Hualapai Parcel remains undeveloped.  This parcel is not subject to any lien or deed of trust of which I am aware, other than a lien for real property taxes.

### F.    Events Leading to Chapter 11.

63.    Like many nonprofit organizations across the country and many providers of medical services generally (not-for-profit and for-profit), the Debtor has been facing significant financial pressures.  These pressures arise from the protracted decline in the economy, decreases in medical reimbursement rates from managed care payor entities, increases in operational costs, decreases in the amount and availability of charitable donations, a reduction in research funding opportunities and increased competition.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

64.    According to the Debtor's unaudited statement of operations and changes in net assets ("Operating Statement"), for the 12 months ended December 31, 2010, the Debtor generated unrestricted revenues and other support, including federal grants, state grants, and other grants, of approximately $49.9 million and had expenses of approximately $73.4 million, resulting in a loss from operations of approximately $23.4 million.  By contrast, the Debtor's audited Operating Statements for 2009 and 2008 reflect income from operations of approximately $706,000 and approximately $2.5 million, respectively.  These financial statements likewise reflect that the Debtor generated approximately $2.9 million in temporarily restricted donations, grants and investment income during 2010, but had generated approximately $4.8 million and $20.0 million of such funds in 2009 and 2008, respectively.

65.    Beginning in 2010, the Debtor sought to address this situation by pursuing a strategic partnership or other transaction.  In March 2010, the Debtor engaged Cain Brothers, an investment banking firm with particular expertise in the healthcare industry, to locate a suitable strategic partner or other transaction.  During the following one-year period, Cain Brothers conducted a search for potential strategic partners or other transactions and helped to conduct due diligence.  During that period, the Debtor engaged in negotiations with several parties, but ultimately did not reach an agreement on a transaction with any of them.

66.    By March 2011, the Debtor was facing an acute liquidity shortage and the prospect that the Debtor would default under both its Credit Agreement and the indenture governing the Public Bonds.  In response to these developments, the Debtor retained A&M to assess the Debtor's operations, develop a business plan for stabilizing the Debtor's liquidity situation, assist the Debtor's counsel in negotiating a forbearance with the Lenders, and assist the Debtor in developing a long-term restructuring aimed at maximizing value and preserving the philanthropic mission of the Debtor (including maintaining high quality patient care).

67.    Working together with A&M and the Debtor's counsel, the Debtor negotiated a forbearance agreement dated March 29, 2011, which agreement thereafter was amended on April 25, 2011 and July 18, 2011 (as amended from time to time, the "Forbearance Agreement").  Pursuant to the Forbearance Agreement and the subsequent Plan Support Agreement (defined and

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

discussed below), the Agent and the consenting lenders agreed to forbear from exercising remedies through the Petition Date. Pursuant to those agreements, as well as certain written consents (the "Consents"), the Agent has released an aggregate $8.55 million from the Cash Collateral Account to fund the Debtor's operating losses, including its restructuring costs prior to a bankruptcy filing.

68. At the insistence of the Board, the Forbearance Agreement also included a commitment by the Agent to release millions of dollars of additional funds from the Cash Collateral Account in order to conduct an orderly wind down of the Debtor's operations and preserve patient safety in the event a liquidation became necessary.

69. Pursuant to the foregoing agreements with the Agent and the Lenders, the Debtor was required to (i) obtain an additional $2.5 million in charitable donations that could be used to fund operations, (ii) limit its expenditures to those specified in a budget developed by A&M and approved by the Agent, (iii) agree to the release of an aggregate $11.5 million from the Cash Collateral Account to permanently reduce the outstanding indebtedness under the Credit Agreement, (iv) implement an operational restructuring plan that was developed by A&M, and (v) develop a contingency plan for winding down the Debtor's operations if its efforts to find a strategic partner were not successful. The Debtor satisfied all of these requirements.

70. The operational restructuring, which was approved by the Board and implemented beginning on April 8, 2011, involved: (i) the reduction of research activities that were not funded by outside sources; (ii) the discontinuation of services that were not economically self-sustaining; (iii) the termination of certain physicians whose salaries and other costs were not economically justified by the size or profitability of their practice; (iv) the reduction of operating costs through the outsourcing, downsizing, elimination and/or consolidation of employment positions; (v) the consolidation of all operations into the Flagship Building by vacating both the Administration Building and the Research Building; and (vi) the elimination of the employer match component of the 401(k) and 403(b) retirement plans.

71. In the aggregate, the operational restructuring involved the termination of approximately 160 employees of NVCI, all of whom were given notice on April 8, 2011, and most

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

of whom were terminated as of that date. A relatively small number of those terminations were effectuated in subsequent weeks.

72.    The operational restructuring was designed to, and ultimately succeeded in, quickly bringing expenses more in line with revenues, reducing operating expenditures by at least $10 million on an annualized basis, and permitting a slimmed-down organization to continue its important work, while it developed a long-term solution to its financial situation.

73.    In April 2011, after the Debtor and Cain Brothers mutually terminated their investment banking relationship, the Debtor hired a new investment banking team at J.P. Morgan Securities LLC ("JP Morgan"), which team specializes in transactions in the not-for-profit healthcare field. JP Morgan assisted with the preparation of a confidential information memorandum, surveyed the marketplace to identify potentially interested parties and reached out to those parties it determined were most likely to be interested in a transaction with the Debtor.

74.    In the aggregate, JP Morgan made contact with approximately 20 public and private entities, three of which executed non-disclosure agreements and received confidential information memoranda. Several entities also conducted site visits. As part of its comprehensive process, JP Morgan identified and reached out to parties who might have interest in acquiring the Debtor's real estate, in addition to parties interested in its operations. The level of interest in the Debtor and its assets, however, was very limited. The Debtor's principal assets (i.e., cancer treatment and research buildings) are highly specialized, subject to significant land use restrictions (as noted above), and simply not in great demand – particularly in the current economic climate.

75.    Nevertheless, as a result of these efforts, two entities interested in the Debtor's clinical and research operations conducted due diligence and thereafter presented the Debtor with written expressions of interest. On July 25 and 26, 2011, these two entities made presentations regarding their respective proposals to a group comprised of members of the Board, the Debtor's counsel, JP Morgan representatives, and me. At the request of the Agent, a subsequent meeting was held with one of those entities the following week. Based upon these meetings, representatives of the Debtor, including JP Morgan, thereafter negotiated with both entities in an effort to improve their respective proposals and negotiate a mutually acceptable, non-binding letter

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

of intent setting forth the material terms of a transaction.  These negotiations continued throughout August 2011.

76.     As a result of these efforts, and with the input of the Agent and Lenders, the Board determined to proceed with the acquisition proposal presented by The Regents of the University of California on behalf of its UC San Diego Health System ("UCSD"), pursuant to that certain executed Letter of Intent dated August 30, 2011 (the "Letter of Intent").  The Letter of Intent indicates the parties' mutual interest in negotiating a transaction under which UCSD would acquire the Flagship Building and substantially all of the personal property of the Debtor used in connection with its operations for $18 million in cash (subject to higher and better offers), pursuant to Bankruptcy Code section 363 (the "UCSD Sale").  The Letter of Intent contemplates that UCSD will use those assets to operate a nonprofit cancer center, consistent with the philanthropic mission of the Debtor.

77.     A critical component of the Letter of Intent was the Debtor's commitment to raise $15 million in philanthropic support over a five-year period to support UCSD's efforts post-closing.  UCSD was not willing to proceed with a transaction without this philanthropic commitment.[9]

78.     In conjunction with its negotiation of the Letter of Intent, the Debtor also entered into negotiations with the Agent and the Lenders regarding the restructuring of the Debtor's obligations to the Lenders, the disposition of those assets that are not included in the UCSD Sale, and the long-term reorganization of the Debtor as a go-forward, philanthropic entity.  These negotiations resulted in the execution of that certain Plan Support Agreement dated September 16, 2011 (as thereafter amended, the "Plan Support Agreement"), which agreement incorporates as an exhibit a certain term sheet setting forth the material terms upon which the Lenders would support such efforts (as amended, the "Term Sheet").  True and correct copies of the Plan Support Agreement and Term Sheet, and the amendments thereto, are attached hereto as Exhibit 2.  Pursuant to the Plan Support Agreement and Term Sheet:

---

[9]     As discussed below, the amount of this philanthropic commitment was subsequently increased.

134136.16

21

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

i.          The Agent and the Lenders consent to the proposed sale to UCSD, provided that they receive $18 million in immediately available funds upon the consummation of the sale and that the terms of the sale otherwise conform to the Letter of Intent, and provided that the Agent has the right to consent to the procedures for such sale, the terms of any auction and the form and substance of any order approving such sale.

ii.          The chapter 11 plan for the Debtor will provide for the continuation of the Debtor as a philanthropic entity ("Reorganized Debtor"), replacement of the Debtor's remaining obligations to the Lenders (after payment of the $18 million described in the preceding Paragraph) with a $13 million note secured by the Research Building (including all personal property therein) and the Vacant Land ("Research Building Note"), the payment of fees, costs and expenses of the Agent and Lenders, and consent rights in favor of the Agent with respect to any distributions on account of claims junior or subordinated to the Lenders.

iii.          The Research Building Note will be a non-interest bearing, non-recourse obligation, payable in full on the earlier of (x) the fifth anniversary of the date of its execution, (y) default thereunder, or (z) upon the sale of the Research Building or the Vacant Land.  Under the Research Building Note, the following amortization payments will be due: $250,000 on the first anniversary of the effective date of the plan ("Effective Date"), $250,000 on the second anniversary of the Effective Date, $350,000 on the third anniversary of the Effective Date, and $400,000 on the fourth anniversary of the Effective Date.

iv.          The Reorganized Debtor will bear sole responsibility for maintaining the existing condition of the Research Building and Vacant Land, will bear the cost of maintaining all insurance and taxes in respect of these properties, will provide an environmental indemnity, and will continue to be obligated under the BofA Deed of Trust on the Research Building and Vacant Land.

v.          If the Research Building and/or the Vacant Land are sold for an aggregate amount in excess of $13 million (the "Excess Consideration") during the term of

the Research Building Note or at any time within one year of repayment thereof, the Reorganized Debtor will cause the Excess Consideration to be shared with the Agent on an 80/20 basis (i.e., with 80% of the Excess Consideration being paid to the Agent, for the ratable benefit of the Lenders, and 20% of the Excess Consideration being retained by Reorganized Debtor).

       vi.        The forbearance period under the Forbearance Agreement was extended through the filing of this case, but not later than December 2, 2011.  Pursuant to the Plan Support Agreement, the Term Sheet and the Consents, the additional sum of $2.75 million was released from the Cash Collateral Account to fund the Debtor's operations and restructuring expenses through the Petition Date.[10]

       vii.       The Agent and the Lenders will release additional funds from the Cash Collateral Account (in addition to the $8.55 million described in Paragraph 67), provided that certain conditions are satisfied, including the following conditions applicable only until the UCSD Sale is consummated: (i) that UCSD post a non-refundable deposit, payable to the Debtor if the transaction does not close as a result of a breach by UCSD, (ii) that such additional releases from the Cash Collateral Account not exceed the amount of UCSD's deposit, (iii) that the UC Regents approve the transactions contemplated by the Letter of Intent, except to the extent such approval is not necessary, and (iv) that the Agent shall have received evidence of unconditional written commitments for donations or a financial backstop in the aggregate amount of $4.5 million (or such other amount as is required as a condition to the closing of the UCSD Sale).

       viii.      The Agent and the Lenders will consent to the Debtor's use of cash collateral during the pendency of a bankruptcy case, pursuant to a cash collateral stipulation and budget.

---

[10]  This $2.75 million amount is part of the aggregate $8.55 million figure described in Paragraph 67 above.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

134136.16

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

79.    Following entry into the Letter of Intent, each of UCSD and the Debtor, through their respective business representatives and counsel negotiated the documentation of the transactions contemplated by the Letter of Intent and Plan Support Agreement, i.e., an asset purchase agreement and related documents (the "APA").  These negotiations were undertaken in good faith and at arm's length.[11]

80.    One significant issue that arose in connection with negotiation of the APA was the amount of the Debtor's philanthropic commitment to UCSD.  Although the Letter of Intent contemplated an aggregate philanthropic commitment of $15 million over 5 years, UCSD subsequently required that such commitment total $20.8 million over that period, as specified in the "Funding Agreement" entered into in connection with the APA (the "Philanthropic Commitment").  Another significant issue was the requirement of UCSD that a substantial portion of the Philanthropic Commitment be backed by some form of financial assurance.  The Debtor did not (and does not) have a means of providing such assurance on its own.

81.    Given the Debtor's present financial circumstances, and the prospect that the cancer services provided at the Flagship Building will need to be shut down if the Debtor cannot timely consummate the UCSD Sale, the Engelstad Family Foundation agreed to amend the Gift Agreement so that the $15 million Engelstad Endowment Fund would serve as a financial backstop for a substantial portion of the Philanthropic Commitment, as specifically set forth in the

---

[11]    The APA contemplates, among other things, that UCSD or a management services organization with which it contracts (an "MSO") will offer employment to existing employees of the Debtor and physician employees of the non-debtor Medical Group.  These provisions, however, do not involve the employment of: (i) members of the Board, none of whose members are employed by the Debtor or the Medical Group, or (ii) A&M personnel.  There is no agreement between UCSD and A&M with respect to providing any post-closing services, and if UCSD seeks to contract for any post-closing support from A&M, the Debtor and A&M will promptly disclose the matter to the Court.  Likewise, I am not aware of any agreement between UCSD and the Board, whose members are volunteers, other than the provision of Section 6.6 of the APA which contains a covenant that members of the Board will "work and reasonably cooperate" with UCSD to promote philanthropic support for UCSD's operations post-closing.  To the extent UCSD or the MSO has made offers of employment to employees of the Debtor and physician employees of the non-debtor Medical Group, I am not aware of the terms of those offers.

134136.16                                                24

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1  Gift Amendment and the Funding Agreement.  Amounts that are not disbursed in satisfaction of

2  the backstop obligation will remain part of the Engelstad Endowment Fund, subject to the original

3  terms and conditions of the Gift Agreement.  As noted above, in accordance with the Gift

4  Amendment, the Debtor transferred the funds comprising the Engelstad Endowment Fund into an

5  escrow account.

6        82.    In addition to reaching agreement with UCSD on the form of the APA and the form

7  of financial assurance in respect of the Philanthropic Commitment, the Debtor reached agreement

8  on the form of a chapter 11 plan ("Plan") and disclosure statement ("Disclosure Statement") with

9  the Agent and more than a majority of the Lenders holding at least two-thirds in amount of the

10  Bank Debt.

11        83.    On November 10, 2011, the Board held a meeting at which it considered and

12  approved, among other things, the Debtor's entry into the APA.  On November 16, 2011, the

13  Board held a meeting at which it considered and approved, among other things, the

14  commencement of a voluntary chapter 11 case for the Debtor.

15        84.    As of the date of this Declaration (the "Petition Date"), the Debtor is filing its

16  voluntary petition and commencing this case in order to implement the foregoing transactions,

17  preserve the value of its assets, and maximize the recovery of its creditors, while preserving its

18  mission (including ensuring the highest quality of patient care).

19  **III.**

20  **FIRST DAY MOTIONS AND APPLICATIONS**

21      **A.**    **Cash Collateral Motion.**

22        85.    The Debtor and the Agent, on behalf of the Lenders, have entered into a stipulation

23  regarding the use of cash collateral in this case (the "Cash Collateral Stipulation"), which is

24  attached as an Exhibit to the *Emergency Motion for Interim and Final Use of Cash Collateral* (the

25  "Cash Collateral Motion") filed concurrently herewith.  With assistance from A&M, the Debtor

26  has examined its operations to determine how much cash collateral it needs to use following the

27  petition date.   Attached to the Cash Collateral Stipulation are detailed cash flow projections

28  reflecting anticipated revenues and expenditures for 19 weeks, based upon the Debtor's historical

experience and current information; these projections constitute the "Budget" referenced in the Cash Collateral Stipulation.

86.     The Debtor has attempted to account for the effect that its chapter 11 filing will have on its operations pending the closure of the UCSD Sale.  While no projection can predict the future or anticipate every contingency, I believe that these projections are reasonable and are based on reasonable assumptions regarding the Debtor's operations during the period covered,

87.     The projections show that without the use of cash collateral – including cash from the Cash Collateral Account – the Debtor will not be able to continue its operations.  Substantially all of the Debtor's assets are subject to liens and there is no significant unencumbered property available to fund its day-to-day operations.  The inability to use cash collateral would precipitate an abrupt cessation of operations, as the Debtor would not be able to meet payroll obligations, pay for critical supplies, or meet any other operating expenses.

88.     An abrupt closure, in turn, would interfere with the treatment of thousands of patients who currently are undergoing treatment.  In order to protect the safety and well-being of those patients, the Debtor seeks to use cash collateral pursuant to the Cash Collateral Stipulation to continue its operations.  The continued use of cash collateral is the only way to protect and preserve patient health and safety, the Lenders' interests in the collateral and the Debtor's going concern value.  There is no source of cash available to meet the needs of patients and preserve the value of the Debtor's assets other than the cash in which the Agent asserts an interest.

89.     The projections underlying the Budget reflect several critical assumptions.  The first of these assumptions is that this Court enters an order approving bidding procedures with respect to the proposed UCSD Sale, and that UCSD funds into escrow a $1.8 million deposit pursuant to the APA.  Entry of the proposed bidding procedures order is a prerequisite to UCSD's obligation to make that deposit.  The funding of that deposit, in turn, is a prerequisite to the Agent's obligation under the Plan Support Agreement and Stipulation to release funds from the Cash Collateral Account.  As reflected in the Budget, the funds to be released from the Cash Collateral Account are necessary to maintain operations through the anticipated conclusion of the sale process.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

90.     The other critical assumption is that the sale process itself will end – i.e., the Court will enter an order approving the UCSD Sale and the sale transaction will close –  no later than the week ended January 20, 2012.  The projections underlying the Budget do not provide for continued operations at the Flagship Building or the UMC location (i.e., the funding of continued operating losses) after that date.  The Budget anticipates that by such date, UCSD will have taken possession of, and begun operating in, the Flagship Building and the UMC location.

**B.     Sale and Bidding Procedures/Order Shortening Time.**

91.     As discussed above, as a result of its extensive prepetition marketing efforts, the Debtor has found that third-party interest in an acquisition or other transaction with the Debtor is very limited.  The Debtor's principal assets are highly specialized cancer treatment and research facilities that are subject to significant land use restrictions and not in great demand – particularly in the current economic climate.  Despite significant operational improvements and cost-cutting measures introduced in April of this year, the Debtor continues to operate at a loss, especially given restructuring costs.  Under these circumstances, the Debtor has concluded that its only realistic opportunity to maximize value and preserve its philanthropic mission is through the prompt consummation of the UCSD Sale and confirmation of the Plan.

92.     The Debtor's ability to meet these objectives depends upon its ability to fund operations pending approval and implementation of the UCSD Sale.  The Debtor's ability to maintain those operations, in turn, depends upon its ability to obtain sale-related relief from this Court on an expedited basis, so that the sale can close no later than January 20, 2012.  If the Debtor is not able to consummate the UCSD Sale within this time-frame, the Debtor effectively will lose its opportunity to preserve its going concern value and its philanthropic mission.  The Budget assumes that the UCSD Sale will be closed, and that UCSD will commence its own operations, no later than the week ended January 20, 2012.  As noted, the Budget does not provide for continued operations (i.e., the funding of continued operating losses) after that date.

93.     If the UCSD Sale closes on or before January 20, 2012, the remaining funds in the estate will be used to fund solicitation, confirmation and implementation of the Debtor's Plan.  If the closing of the UCSD Sale does not occur during or prior to that week, the remaining funds in

Klee, Tuchin, Bogdanoff & Stern llp
1999 Avenue of the Stars, Thirty-Ninth Floor
Los Angeles, California 90067
Telephone: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1  the estate will be needed to fund an orderly wind-down of operations in a manner that ensures

2  patient safety, continuity of care, the orderly transfer of patients, and compliance with applicable

3  law.

4  94.    The sale-related relief for which the Debtor seeks expedited approval includes the

5  approval of certain bid procedures, a break-up fee equal to 4% of the purchase price offered by

6  UCSD, and up to $250,000 in expense reimbursement, all as more specifically described in the

7  APA and the Debtor's moving papers.  These provisions were a highly-negotiated component of

8  the APA.  Based upon my participation in the negotiations, the Debtor's agreement to these

9  provisions (particularly the break-up fee and expense reimbursement) was a necessary inducement

10  for UCSD to expend the considerable time and resources necessary to pursue this transaction.

11  95.    The only parties of which I am aware that may assert liens in the property that is

12  the subject of the UCSD Sale are the Agent (for the ratable benefit of the Lenders, with respect to

13  real and personal property), Oncology Supply (with respect to personal property), taxing and/or

14  special improvement authorities (with respect to real property), and the Summerlin South

15  Community Association (with respect to real property).  At my request and under my direction,

16  A&M personnel reviewed the list of active UCC financing statements prepared as an Exhibit to

17  the APA and determined that all of them, except for those pertaining to the security interests of the

18  Agent and Oncology Supply, pertain to leased equipment.

19  **C.    Employee Compensation, Taxes and Benefits.**

20  **1.    Overview.**

21  96.    The Debtor employs approximately 153 employees, including 62 exempt (i.e.,

22  salaried) employees and 91 non-exempt (i.e., hourly) employees.  These employees collectively

23  include researchers, nurses, social workers, technologists and administrative staff.  The seven

24  physicians who provide clinical services at the Flagship Building and UMC location are employed

25  by the non-debtor Medical Group.  As discussed above, the Medical Group remits to the Debtor

26  all of the income generated from patient services.  In turn, the Debtor pays all compensation and

27  benefits owing to the seven Medical Group physicians, and handles all billing, administration and

28  management in respect of the services they provide.

134136.16

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

### 2.    The Need for Immediate Relief.

97.    The prospect of immediate and irreparable harm absent the requested relief is genuine.  NVCI previously implemented a significant reduction in force (which included both employees of the Debtor and physicians of the Medical Group).  Given those reductions and the uncertainty surrounding the future of NVCI, a number of key personnel have since departed on their own initiative, over the course of the last six months.  In order to maintain the morale of the remaining employees and physicians in the face of uncertainty, the Debtor must provide assurance that employee compensation and benefit obligations will be timely satisfied.  Absent that assurance, additional employees and physicians are likely to resign.  Such departures, in turn, would have a direct adverse impact on the Debtor's ability to consummate its reorganization.

### 3.    Employee Compensation.

98.    All employees of the Debtor and Medical Group physicians are paid on a semi-monthly basis.  They typically receive a paycheck (or direct deposit) on the 15th day of each month and the 30th day of each month, about one week in arrears.  If either payroll date falls on a weekend, it is paid on the preceding Friday.  The first payroll of each month (i.e., on the 15th) covers the period from the 24th day of the prior month to the 8th day of the current month.  The second payroll covers the 9th day of the current month through the 23rd day of the current month.

99.    Payroll is normally processed by a third-party provider, Paychex.  From time to time, however, employees receive manual checks drawn on the Debtor's payroll account at Bank of America in order to correct payroll errors, or in connection with a final paycheck for a separated employee.  The average aggregate amount distributed to the Debtor's employees and the Medical Group physicians for each of the last four pay periods is $524,130, including payroll taxes, which amounts to an average of $3,425 per payee.

100.    Typically, several days before a payroll disbursement, Paychex debits the Debtor's payroll account to fund the upcoming payroll.  Paychex also debits the account for payroll taxes at that time.  Paychex then issues paychecks and facilitates direct deposits against a bank account maintained by Paychex in its own name, and withholds and remits the necessary payroll taxes to the appropriate taxing authorities.  The Debtor  receives payroll checks and direct deposit

vouchers from Paychex on the day before the payroll, generally before 2:00 pm Pacific Time. The Debtor's management thereafter distributes the checks and direct deposit vouchers to employees.

101.    The Debtor's most recent payroll date was November 30, 2011. The Debtor funded that payroll prepetition, remitting directly to Paychex on November 29, 2011, the funds necessary to satisfy the payroll and related taxes. The November 30, 2011 payroll covers the period from November 9, 2011 through November 23, 2011. The next scheduled payroll date is on December 15, 2011 (which must be funded on December 14, 2011), covering the period from November 24, 2011 through December 8, 2011.

102.    As of the petition date, the Debtor owed approximately $348,460 in accrued but unpaid compensation (this amount represents expected wages and salaries that accrued between November 24, 2011 and the petition date). In addition, the Debtor is liable for related employer payroll taxes in the approximate amount of $87,115 for the same period. The Debtor seeks authority, in its discretion, to remit these amounts in the ordinary course of business. None of the Debtor's employees or the Medical Group physicians is owed more than $11,725 in wages or salary accrued prepetition.

### 4.    Employee Benefits.

103.    The Debtor provides certain employee benefits to its regular, full-time employees,[12] and to the Medical Group physicians. Employee benefits are a significant and important part of these individuals' compensation. Failure to honor these benefits going forward could cause a significant loss in employee morale and financial hardship.

104.    The extent of certain benefits depends on the manner in which an employee is classified. For these purposes, the employees of the Debtor and the Medical Group physicians are classified into four groups: (1) "Staff," which includes administrative and clerical personnel, nurses, managers, janitorial staff, and the employees of the Debtor's cafeteria and boutique; (2) "Professionals," which is limited to advanced nurse practitioners and physician's assistants; (3)

---

[12]    "Regular" employees are the Debtor's employees who have completed their 90-day probationary period. "Full-time" employees are the Debtor's employees that consistently work a minimum of 32 hours per week.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

"Directors," which includes the heads of various departments, such as radiology and chemotherapy, and any employee with a title of vice-president or above; and (4) "Faculty," which includes the Medical Group physicians, and the medical doctors and doctors of philosophy employed by the Debtor in a research capacity.

### a.    Vacation Time.

105.    The Debtor maintains a vacation policy for all full-time non-Faculty employees, whether salaried or hourly (i.e., this policy does not cover Faculty employees or Medical Group physicians.)  For these employees, vacation begins accruing after ninety days of employment. During the first ninety days of employment, no vacation time is accrued and no vacation may be taken.  After the initial ninety days of employment, employees accrue vacation time according to the schedule set forth below, depending on whether they are Staff, Professionals, or Directors and depending on the length of employment.  All non-Faculty employees can accrue vacation time up to the maximum amount of vacation that such employee may earn in a given year:

| ANNUAL VACATION DAYS ACCRUED BY NVCI EMPLOYEES | | | |
|---|---|---|---|
| **Length of Employment** | **Staff** | **Professionals** | **Directors** |
| 4 to 60 months | 10 | 15 | 22 |
| 61 to 120 months | 15 | 20 | 27 |
| 121 or more months | 20 | 25 | 32 |

106.    Once an employee has accrued the maximum amount of unused vacation days for which she or he is eligible, the employee will not accrue any additional vacation days until the employee has used some portion of the vacation days accrued.  Upon using a portion of the vacation days accrued, the employee will begin to accrue additional vacation days at the applicable rate.  The only instances in which employees may be paid for accrued and unused vacation time is if they convert to part-time status and no longer are eligible to receive benefits and when their employment terminates.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

107.     As of shortly before the Petition Date, the total amount of accrued vacation time owed to the Debtor's full-time, non-Faculty employees was $175,840.  The Debtor is seeking permission to honor, in its discretion, all prepetition vacation time owed to its employees.  None of these employees is owed more than $11,725 in the aggregate for both accrued wages or salary (as applicable) and vacation time.

108.     The vacation policy adopted several years ago for all Faculty employees and Medical Group physicians is that they may take "reasonable" time off, as their schedule and work responsibilities permit, in consultation with their respective supervisors.  Accordingly, the Debtor does not maintain records reflecting the accrual of or subsequent use of vacation time by Faculty Employees or Medical Group physicians.  For this reason, its books and records do not reflect any accrued amounts of vacation for Faculty employees or Medical Group physicians as of the Petition Date.

### b.     Wellness Time, Sick Time, Personal Time and Holidays.

109.     The Debtor's full-time non-Faculty employees are entitled to paid wellness time, sick time, personal time and holidays, all of which begin to accrue on the first day of employment.  These employees are entitled to one wellness day, eleven sick days, three personal days, and two floating holidays per year.  There is no corresponding policy for Faculty employees or Medical Group physicians who, as noted above, may take a "reasonable" amount of time off.

110.     All full-time employees, including Faculty and Medical Group physicians, are entitled to nine paid holidays, as specified by the Debtor (namely New Year's Day, President's Day, Memorial Day, Independence Day, Labor Day, Nevada Day, Thanksgiving Day, the Friday after Thanksgiving Day, and Christmas), each calendar year.

111.     No employees are ever paid for unused accrued wellness time, sick time, personal time or floating holidays, upon separation or otherwise.  Accordingly, there is no prepetition obligation owing in respect of these policies.

### c.     The 401(k) Plan and 403(b) Plans.

112.     The Debtor's full time employees, including Faculty, are eligible to contribute up to $16,500 per year to the Debtor's 403(b) plan, the maximum permitted under federal law.

1  Medical Group physicians are not eligible for the 403(b) plan, but are eligible instead to

2  participate in the Medical Group's 401(k) plan.  Under the 401(k) plan, Medical Group physicians

3  may contribute up to $16,500 per year, the maximum permitted under federal law.  There are no

4  employer match obligations under either plan.

5         113.    As of the Petition Date, no payroll deductions have been made in respect of the

6  403(b) plan or the Medical Group 401(k) plan that have not been remitted to the appropriate plan

7  trustee.  The Debtor, however, intends to deduct from the prepetition wages authorized for

8  payment postpetition by the Court the amounts designated by employees of the Debtor and

9  Medical Group physicians for contribution to the 403(b) or 401(k) plan, as applicable, and remit

10  those amounts postpetition.

11              **d.**       **The Flexible Spending Account Program.**

12         114.    The Debtor offers its full-time employees and the Medical Group physicians a

13  flexible spending program (the "FSA Program").  Employees and Medical Group physicians elect

14  to participate in the program by selecting either a medical or dependent care spending account.

15  The program is called "Take Care," and is insured and administered by Wage Works, a third party

16  provider.  Employees and Medical Group physicians select a total annual contribution to the FSA

17  Program, up to a cap of $2,000 for the medical spending account and a cap of $5,000 for the

18  dependent care spending account.

19         115.    The annual contribution is deducted from the employee's or Medical Group

20  physician's paycheck twice a month, up to 26 times per year.  The deductions are placed into the

21  Debtor's general operating account, and Wage Works deducts the amount necessary to pay

22  approved employee claims under the FSA Program from the operating account on an as-needed

23  basis.  After an employee or Medical Group physician submits a claim to Wage Works for

24  processing, it generally takes 7 to 10 business days for the claim to be processed and paid,

25  assuming there are no errors or other issues with the claim.

26         116.    To the extent that an employee or Medical Group physician submits a claim in an

27  amount that exceeds the employee's or Medical Group physician's current contributions to the

28  FSA Program, but that does not exceed the amount of the employee's or Medical Group

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

physician's total annual contribution to the program, the Debtor typically funds the excess amount. As such, it is common for employees and Medical Group physicians to "max out" their FSA Account within the first half of the calendar year, if not sooner.

117.    Based upon my review of the Debtor's books and records, there are approximately 19 individuals as of the Petition Date with unused contributions under the FSA Program totaling approximately $11,934. These monies are, in essence, being held in trust, until such time as these funds are needed for qualified expenses. In addition, there may be claims submitted prepetition under the FSA Program that have not yet been processed and paid. The Debtor is seeking to honor all prepetition obligations associated with its FSA Program in the ordinary course.

### 5.    Health-Related Benefits.

118.    The Debtor provides its full-time employees and the Medical Group physicians with several health-related benefits, including: (1) medical, dental and vision benefits; (2) life insurance; (3) short-term disability insurance; (4) long-term disability insurance; (5) workers' compensation insurance; (6) an employee assistance program; and (7) supplemental insurance.

### a.    Health Benefits.

119.    The Debtor's medical benefits program is self-insured, subject to a stop-loss policy with Anthem Blue Cross and Blue Shield ("Anthem") that limits the Debtor's liability for medical insurance claims to $100,000 on an individual basis and $600,000 in the aggregate (calculated annually). Anthem also is the claims administrator for the Debtor's medical insurance program.

120.    The Debtor's employees and Medical Group physicians are required to be covered under a medical insurance plan and, if they choose to opt out of the Debtor's plan, they must provide proof that they are covered under another plan. The Debtor's employees and Medical Group physicians may choose from two PPO medical plans under the Debtor's program with Anthem. Depending on which of these plans an employee chooses, the Debtor pays up to 100% of the premium for the employee and up to 75% of the premium for the employee's dependents.[13]

---

[13]    Because the medical benefit program is self-insured, the term "premiums" in this context refers to an actuarial estimate of the cost of providing the subject medical benefits.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

Premiums for dependent coverage are deducted from employee paychecks twice a month, up to 26 times per year.  These deductions are deposited into the Debtor's operating account.

121.    Because of the time it generally takes to process claims, claims are usually funded by the Debtor about two months in arrears.  Based on the recent claims history, the Debtor estimates that, as of the Petition Date, there are approximately $100,000 in eligible claims that have been incurred under its medical benefit program, but that have not been submitted, processed and/or paid by the Debtor pursuant to that program.  As of shortly before the Petition Date, there were approximately $25,705 in administrative fees and stop loss insurance premiums due to Anthem in connection with this program.

122.    In accordance with applicable law, the Debtor offers its employees and Medical Group physicians, upon separation, the opportunity to continue their medical benefits under COBRA.  A third party administrator collects the monthly premiums for the COBRA program from participants in the COBRA program and remits the premiums to the Debtor.[14]  Claims submitted by participants in the COBRA program are processed and paid by the Debtor in the same manner as claims submitted under the medical benefits plan.  My estimate of the outstanding prepetition claims under medical insurance plan in the preceding paragraph is inclusive of claims under the COBRA program.

123.    The Debtor's existing self-insured health benefits program expires by its existing terms on December 31, 2011.  The Debtor intends to enter into an agreement for a new medical benefits program beginning January 1, 2012.

**b.    Dental Benefits.**

124.    The Debtor's dental program is insured through MetLife Company ("MetLife").  Under the Debtor's dental insurance program, the Debtor pays 100% of the premium for its employees and the Medical Group physicians and up to 75% of the premium for their dependent(s).  The amount of the monthly premiums paid by the Debtor to MetLife on account of

---

[14]  Again, the term "premiums" here refers to actuarial estimates of the cost of providing medical benefits to the insured individuals.

dental insurance is approximately $11,200, of which about $2,155 is funded by payroll deductions. The Debtor's existing dental program expires by its existing terms on December 31, 2011. As of shortly before the Petition Date, there was an estimated $23,693 in unremitted premiums due to MetLife under the dental insurance program.

### c. Vision Service Plan.

125. The Debtor's vision insurance is provided by Vision Service Plan ("VSP"). Under the Debtor's vision insurance program, the Debtor pays 90% of the premium for its employees and the Medical Group physicians and up to 25% for their dependent(s). The amount of the monthly premiums paid to VSP on account of vision insurance, is approximately $1,000 per month, approximately $800 of which is funded by payroll deductions. The Debtor's existing vision service plan expires by its existing terms on December 31, 2011. As of shortly before the Petition Date, there was an estimated $1,952 in unremitted premiums due to VSP for the vision insurance program, including amounts deducted from employee payroll.

### 6. Life and Accidental Death & Dismemberment Insurance.

126. The Debtor offers its full-time employees and the Medical Group physicians voluntary life and accidental death and dismemberment insurance ("AD&D") , insured through MetLife. The Debtor pays 100% of the premiums associated with life and AD&D insurance. For Staff and Professionals, the life and AD&D insurance is equal to the employee's annual salary, rounded up to the nearest $1,000, up to a maximum of $200,000. For Directors and Faculty (including the Medical Group physicians), the life and AD&D insurance is in the amount of three-times the employee's annual salary, rounded up to the nearest $1,000, up to a maximum of $500,000. The Debtor pays $402.05 per month in aggregate premiums to MetLife for its AD&D insurance. The Debtor's existing life and accidental death & dismemberment insurance program expires by its existing terms on December 31, 2011. As of shortly before the Petition Date, there was an estimated $7,493 in unpaid premiums due to MetLife for the AD&D insurance.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

### 7.    Short-term and Long-term Disability Insurance.

127.    The Debtor offers its full-time employees and the Medical Group physicians long-term disability insurance and short-term disability coverage, both insured through MetLife.[15]  The Debtor pays 100% of the premium for both long-term and short-term disability insurance for its full-time employees and the Medical Group physicians.  The Debtor's existing short-term and long-term disability insurance program expires by its existing terms on December 31, 2011.

128.    Short-term disability coverage is 60% of the employee's or Medical Group physician's weekly base pay to a maximum benefit of $1,000 per week (with higher limits for up to a maximum of $3,000 per week for the chief executive officer, chief operating officer and chief financial officer[16]) after a 21-day elimination period has been met, and for a maximum of eleven weeks.

129.    Long-term disability coverage is 60% of the employee's or Medical Group physician's monthly base pay to a maximum benefit of $15,000 per month.  Long-term disability begins after ninety days of disability, or after completion of eleven weeks of short-term disability, and is paid until the employee or physician can return to work or until age 65, whichever is sooner.

130.    The Debtor pays approximately $4,943 in total per month in premiums to MetLife for disability coverage (both short-term and long-term combined).  As of shortly before the Petition Date, there was an estimated $4,731 in unpaid premiums due to MetLife for the disability coverage.

### 8.    Workers' Compensation Insurance.

131.    Under Nevada law, the Debtor is required to provide workers' compensation benefits.  The Debtor currently maintains premium-based workers' compensation coverage for its employees and the Medical Group physicians insured through Hartford Insurance Company ("Hartford") up to the statutorily required amount of $1,000,000 per employee for each "injury by

---

[15]    The State of Nevada does not provide either long-term or short-term disability insurance.

[16]    The Debtor currently does not have a chief executive officer or chief operating officer.

accident." (The policy also provides for $1,000,000 in coverage for "injury by disease."). Failure to maintain this coverage could result in the institution of administrative and/or legal proceedings against the Debtor and its officers and directors, and alternative arrangements would almost certainly be more costly. The monthly premium paid by the Debtor to Hartford for this coverage is $33,231.63. The Debtor's existing Worker's Compensation insurance program expires by its existing terms on December 31, 2011. As of shortly before the Petition Date, there was an estimated zero balance in unpaid premiums due to Hartford for workers' compensation insurance.

### 9. Employee Assistance Program.

132. The Debtor offers and pays for a confidential employee assistance program (the "EAP Program") administered through Anthem, which allows up to six free visits to private, professional counseling for the Debtor's employees, the Medical Group physicians and members of their households. Any visits beyond the initial six are not paid for by the Debtor. On average, the Debtor pays Anthem about $285 per month for the EAP Program. The Debtor's existing EAP Program expires by its existing terms on December 31, 2011. As of shortly before the Petition Date, there was an estimated $290 in unpaid fees due to Anthem in respect of the EAP Program.

### 10. Supplemental Insurance.

133. The Debtor also offers four different supplemental income insurance options, insured through AFLAC to its full time employees and the Medical Group physicians. For one of the supplemental insurance plans, the Personal Cancer Indemnity Plan, the Debtor pays 50% of the premium for an employee choosing to participate. All other premiums are paid in full by the employee and are deducted from the employee's paychecks. On average, the total monthly cost of the premiums paid by the Debtor to AFLAC for the supplemental insurance program is approximately $4,000, of which over $3,900 is funded from payroll deductions. The Debtor's existing supplemental insurance program expires by its existing terms on December 31, 2011. As of shortly before the Petition Date, there was approximately $7,086 in premiums that the Debtor had not yet remitted to AFLAC.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

**D.     Business Expense Reimbursements.**

134.     The Debtor also seeks authority, in its discretion, to honor business expense reimbursement requests for amounts incurred prepetition by employees of the Debtor and Medical Group physicians.  These expenses were routinely reimbursed by the Debtor prior to the Petition Date, provided the expenses were authorized and are properly documented.  As of the Petition Date, employees of the Debtor and Medical Group physicians may have incurred various expenses that, consistent with ordinary practice, would be reimbursed by the Debtor, but had not yet been paid.

135.     Employees of the Debtor and Medical Group employees submit expense reports in order to receive reimbursement for their business expenses, to which they must attach receipts or other backup documentation.  Expense reports generally must be submitted within 30 days of incurring the expense and approved by a supervisor.  Upon approval, the Debtor's accounts payable department receives and audits the expense report.  If any inconsistencies are found, the Debtor will request that the employee correct his or her expense report and resubmit it for payment.  If no inconsistencies are found, the Debtor typically issues a reimbursement check within 10 business days of the accounts payable department's receipt of the expense report.

136.     The aggregate amount of business expense reimbursement requests submitted to the Debtor varies each month.  Within the last 12 months, the Debtor has received aggregate reimbursement requests ranging from approximately $10,000 to $15,000 per month.  It is difficult to estimate the exact amount of reimbursable expenses that have not yet been presented to the Debtor for payment, have been presented but have not been processed, or that have been processed and paid by check that did not clear before the Petition Date.  However, based upon my familiarity with the reimbursement requests received in the past by the Debtor, and in light of the significant reduction in force that occurred in April of this year, the actual amount of outstanding reimbursable expenses should be no more than $15,000.

**E.     Utilities.**

137.     In connection with its daily operations, the uses electricity, natural gas, telecommunication, water, propane, waste removal and other utility services from approximately

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1  10 utility companies through roughly 15 different accounts with an average monthly aggregate

2  cost of approximately $90,000.

3        138.    A complete list of the companies that provide these utility services (each, a

4  "Utility" and collectively, the "Utilities") is attached as Exhibit 1 to the *Emergency Motion*

5  *Pursuant to Local Bankruptcy Rule 4001(c) for Order Determining Adequate Assurance of*

6  *Payment for Postpetition Utility Services* (the "Utilities Motion") filed concurrently herewith.

7        139.    Uninterrupted utility services are essential to ongoing operations.  If one or more of

8  the Utilities were permitted to terminate services, even briefly, there would be a disruption to the

9  provision of patient care and a threat to patient safety.  Indeed, an interruption in utility service

10  could prevent patient examinations, infusion or radiation treatments and diagnostic testing for

11  patients, and interrupt the provision of services and procedures before they are completed.

12        140.    Also, many of the medications, chemicals and diagnostic samples maintained at the

13  Flagship Building are temperature-sensitive and would be destroyed if they are not maintained in a

14  refrigerated state for even a short period of time.  Replacing these items would be time-consuming

15  and costly – if they are replaceable at all – and could disrupt both the provision of treatment and

16  ongoing research activities.

17        141.    As a result, the relief requested in the Utilities Motion is critical and should be

18  approved as soon as possible.

19        142.    I understand that the Debtor must provide its Utility Providers with "adequate

20  assurance" of payment for postpetition services shortly after the commencement of this case.  It

21  also is my understanding that, without relief of the Court, a Utility Provider could terminate

22  services to the Debtor if it was not satisfied with the "adequate assurance" of payment provided.

23        143.    The Debtor has requested that the Court approve the Debtor's funding of deposits

24  in the aggregate amount of approximately $90,000.  Each of the individual deposits proposed on

25  Exhibit 1 to the Utilities Motion represents the average monthly billings for each Utility over the

26  most recent 12-month period for which data was available to the Debtor.

27

28

144.     The Debtor also is requesting Court approval of procedures that will resolve requests by Utilities for additional assurance of payment, without risking the precipitous termination of utility services.

**F.      Bank Accounts.**

**1.    The Trust Fund Accounts.**

145.     The charitable trust funds comprising the Patient Cares Committee Fund, the Saffer Endowment Fund, and the Other Donor-Restricted Funds are held in three segregated accounts at Bank of America (the "Trust Fund Accounts").  To the extent authority is necessary, the Debtor is seeking authority to keep the Trust Fund Accounts open.  Doing so will enable the Debtor to ensure that the Patient Cares Committee Fund, the Saffer Endowment Fund, and the Other Donor-Restricted Funds remain segregated from funds that are property of the estate, and are properly accounted for.

**a.      The Patient Cares Committee Fund**
**(Account No. 501010959909).**

146.     The Patient Cares Committee Fund is held in Bank of America Account No. 501010959909.  There are prepetition checks outstanding against this account in the estimated amount of up to $2,500.  To the extent such authority is necessary, the Debtor seeks authority not only to keep this account open, but to honor those outstanding obligations so as to avoid any hardship to the recipients thereof.  Dishonor of those checks would undoubtedly result in a hardship to the cancer patient-recipients of those funds, i.e., individuals who were issued those checks for the very purpose of addressing an existing hardship.

**b.      The Saffer Endowment Fund**
**(Account No. 501010203655).**

The Saffer Endowment Fund is maintained in a segregated premium checking account, Bank of America, Account No. 501010203655.  There are no checks outstanding against this account.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

### c.    Other Donor Restricted Funds
### (Account No. 501010966248)

147.    The Other Donor-Restricted Funds are on deposit in a segregated deposit account at Bank of America, Account No. 501010966248.  This account does not permit checks to be written against it.

### 2.  The Cash Collateral Account.

148.    The Cash Collateral Account described above is an investment account maintained with Merrill, Lynch, Pierce, Fenner and Smith ("MLPFS"), Account No. 7HK-02063.  Pursuant to the Cash Collateral Stipulation, the Agent is to cause disbursements to be  made from that account for use by the Debtor, in accordance and subject to the terms of the Cash Collateral Stipulation. The Debtor is requesting that this account be permitted to remain open, in order to avoid any confusion or delay in respect of such disbursements.

### G.    Bar Date.

149.    The Debtor has filed its motion requesting that the Court establish January 23, 2012 as the general bar date, and establish other dates, deadlines and procedures with respect to the filing of proofs of claim in this case.

150.    The requested relief is intended to help the Debtor assess the amount, nature and priority of claims that parties in interest may assert against the estate, other than the claims listed in its Schedules of Assets and Liabilities ("Schedules").  The establishment of a deadline for filing proofs of claim will be instrumental to this effort, as it is my experience that parties invariably assert claims of which the debtor was not aware or that differ in amount or priority from those that are scheduled by the debtor.

151.    As I understand the plan solicitation process, the occurrence of the bar date also is a predicate to identifying the universe of creditors whose acceptances and rejections of the Plan will need to be solicited.  Pursuant to the Plan Support Agreement, the Debtor must obtain confirmation of the Plan no later than the 120th day following the Petition Date, i.e., March 29, 2012.  The proposed general bar date of January 23, 2012 is intended to facilitate a solicitation of

134136.16

acceptances and rejections to the Plan beginning as early as February 6, 2012, in an effort to meet that plan confirmation milestone.

### H.     Motion Regarding Patient Care Ombudsman.

152.     Patients who receive treatment at the Debtor's facility are generally referred to one of NVCI's physicians by their physician at UMC.  Patients may seek treatment at the Debtor's facility based on outreach programs such as the Debtor's mobile diagnostic unit or "Hope Coach."

153.     A patient's course of treatment is prescribed by and overseen by one of NVCI's physicians, but treatment is provided by the nurses and technicians employed by the Debtor.  The two main types of treatments administered by the Debtor's employees are infusions of chemotherapy and other drug treatments, and radiation oncology treatments.  All treatments are performed on an outpatient basis.  In each case, patients come in for treatment and are monitored by nurses and technicians for a period of time after the treatment is completed.  The Debtor has comfortable treatment areas where patients and family members can feel at home during lengthy treatments, waiting periods, and post-treatment monitoring.  Patients that require additional medical care or overnight monitoring following a treatment are transferred to another facility (not operated by the Debtor) for such care.  There is also a series of exam rooms at the Debtor's facility that are used for consultations and observation and assessment of patients undergoing treatment.

154.     The Debtor and its employees are committed to ensuring the highest quality of patient care and patient safety pending the sale of the Flagship Building to UCSD.

### 1.     The Debtor's Internal Quality and Safety Resources.

155.     The Debtor has a strong and effective internal infrastructure devoted to ensuring and improving patient safety and quality patient care, the major components of which are discussed in detail below.

### a.     Key Personnel.

156.     The key personnel that oversee the provision of patient care at the Debtor's facility and ensure compliance with the Debtor's quality and safety initiatives are Karen Watnem, R.N., B.S.N., the Debtor's Director of Nursing, and Kevin Andrada, CNMT, PET, RT (N), the Debtor's Director of Diagnostic Imaging and Radiation Oncology.  Ms. Watnem has 14 years of experience

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

as a clinical nurse, including significant managerial and oncology experience, and holds a degree in nursing from Holy Family University of Pennsylvania.  Mr. Watnem is also a member of the Infusion Nurses Society and the Oncology Nurses Society.  Mr. Andrada holds a bachelor of science in nuclear medicine from the University of Nevada, is licensed by the Nuclear Medicine Technology Certification Board and is a member of the American Registry of Radiologic Technologists.  Mr. Andrada is also pursuing a masters in health care administration.  The resumes of Ms. Watnem and Mr. Andrada are attached to the *Emergency Motion for Interim and Final Orders Pursuant to Local Bankruptcy Rule 4001(c) Regarding Patient Care Ombudsman  Under Section 333(a)(1) of the Bankruptcy Code* (the "PCO Motion") as Exhibit 1.

157.    Together, Ms. Watnem and Mr. Andrada are responsible for: (i) coordinating the Debtor's quality assurance and compliance programs; (ii) monitoring quality indicators; (iii) development and review of policies and procedures; including safety improvement priorities; (iv) collaborating with the Debtor's other clinical services personnel to provide quality and safety reports to the Debtor's management; (v) participation in external monitoring activities; and (vi) receipt and review of all patient complaints and feedback.

158.    Ms. Watnem, Mr. Andrada and the rest of the Debtor's clinical staff will be guided through the chapter 11 process by me and the rest of my staff.   I meet regularly with the Debtor's clinical employees to ensure that operations run smoothly, appropriate funds are available for the purchase of the oncology drugs and medical supplies needed for the treatment of patients, and that patient care and safety remains a central focus during the restructuring process.

159.    Diane Rafferty, a director with A&M, was appointed as the Debtor's Vice President, Outcomes & Quality effective as of the Petition Date.  Ms. Rafferty has over 30 years of experience in the healthcare industry and brings extensive expertise in hospital operations, finance, quality and compliance.  Prior to joining A&M, Ms. Rafferty served as the Executive Vice President and Chief Administrative Officer for Brotman Medical Center, which she joined while the facility was in chapter 11 and saw through a successful restructuring.  Ms. Rafferty has also served as a surveyor and clinical investigator with The Joint Commission (formerly the Joint Commission on Accreditation of Healthcare Organizations), the chief executive officer of San

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

1  Ramon Regional Medical Center, and the chief operating officer of USC University Hospital.  Ms.

2  Rafferty holds a degree in nursing from the University of New York and a masters in Healthcare

3  Administration from the University of La Verne.  Additional information on Ms. Rafferty's

4  experience and qualifications is included in the professional biography attached to the PCO

5  Motion as Exhibit 2.  Ms. Rafferty will be responsible for supervising Ms. Watnem and Mr.

6  Andrada, oversight of the Debtor's quality assurance and compliance programs, review of quality

7  and safety reports, and conducting regular site visits and staff meetings.

8      160.    As discussed above in paragraph 71, the Debtor underwent a significant reduction

9  in force in April of 2011 in connection with its prepetition operational restructuring.  The bulk of

10  the employees terminated at that time were administrative or part of the Debtor's research

11  program, but the Debtor did terminate a limited number of clinical employees.  Subsequently,

12  certain clinical employees submitted voluntary resignations.  However, the Debtor's patient census

13  also decreased during this time period, allowing the Debtor to maintain a consistent ratio of staff

14  to patients and patient care and treatment to continue without interruption.  The management team

15  is using one-on-one meetings, open forums and frequent staff meetings to communicate with

16  employees, allow for feedback and decrease anxiety and voluntary terminations.  These techniques

17  have allowed the Debtor to maintain an adequate number of trained personnel to deliver patient

18  care that meets with both internal and external quality and safety regulations.  Notably, the Gold

19  Seal of Approval$^{TM}$ that the Debtor's treatment center recently earned from the TJC was based on

20  an accreditation process that occurred approximately three months after the Debtor conducted its

21  significant reduction in force.

22          **b.    Management of Patient Complaints and Feedback.**

23      161.    The Debtor relies on patient comment cards as well as patient interviews to collect

24  patient feedback.  The comment cards are available at various locations throughout the institute

25  and are also provided to patients upon request.  Patients can either give the completed card to a

26  nurse or other staff member, or can place the form in a suggestion box located on the ground floor

27  of the institute.  Ms. Watnem and Mr. Andrada review and process each form, and either follow up

28

on the concerns raised on the cards personally or refer the issue to the appropriate employee and monitor the issue to ensure that it is resolved expeditiously.

162.    If one of the Debtor's staff members receives a verbal patient complaint or observes a patient safety issue, the employee is trained to take steps to respond to the complaint or remedy the issue, and submits a form to Ms. Watnem documenting the complaint or issue and resolution thereof.  Ms. Watnem collates data on patient complaints and feedback received through the above-described system and creates reports on patients complaints and concerns for the Patient Satisfaction Committee (discussed in paragraph 164 below)

163.    The Debtor has an excellent record of patient care and satisfaction, as evidenced by the fact that patient complaints against the Debtor are very rare.  Historically, the Debtor has had a very low level of patient complaints, amounting to a complaint rate of less than 0.5%.  Moreover, to the best of my knowledge, there are no lawsuits pending against the Debtor or the NVCI physicians for malpractice or deficient patient care.

### c.    The Quality and Safety Team.

164.    Ms. Watnem and Mr. Andrada work with a series of committees and various employees of the Debtor (collectively, the "Quality and Safety Team") to monitor issues relating to patient safety and the quality of patient care, address areas of concern, and proactively implement policies and procedures.  Regular reports on the findings and activities of the Quality and Safety Team are given to the Debtor's management and board of directors.  The following is a brief description of each of the components of the Quality and Safety Team.

- **Radiation Safety Committee**: this committee, chaired by Mr. Andrada, ensures that all radiation-related equipment is properly maintained and calibrated, trains staff to comply with internal and external policies, monitors and investigates sentinel events, reviews records and inventory of radioactive material, and instructs and consults with the Debtor's staff regarding protection from exposure to radiation.  This Committee meets at least monthly, but often meets on a weekly basis.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

- **Pharmacy and Therapeutics Committee**: this committee, staffed by a Medical Group physician and Joshua L. Mark, the Debtor's Director of Pharmacy and a Board Certified Oncology Pharmacist, ensures that there is appropriate control over and monitoring of the pharmaceuticals kept at the Debtor's facility and investigates any irregularities.  This committee meets on a monthly basis.

- **Environment of Care Committee**: This committee is chaired by Steve Archer, the Debtor's director of facilities, and monitors air quality, temperature control, and the status and repair of the facility's fire alarms, generators and emergency systems.  This Committee meets on a quarterly basis.

- **Security Officer**: the Debtor's security officer, John Haynes, coordinates the Debtor's security initiatives and is responsible for asset management and physical security.

- **Safety Officer**: the Debtor's research and radiation safety officer, Darnell Johnson, B.S., H.S.E., M.S., conducts safety inspections and recordkeeping for the Occupational and Safety Health Administration ("OSHA"), ensures that the Debtor properly stores and disposes of hazardous materials and waste, conducts risk management activities, and generally assists with formulation, implementation and enforcement of the Debtor's safety policies.

- **Infection Control Committee**: this committee, staffed by Ms. Watnem, Mr. Andrada and Mr. Johnson, monitors incidences of unusual or "hospital-acquired" infections among patients at the Debtor's facility, ensures that the facility has appropriate infection prevention policies and procedures in place, as well as adequate supplies to allow the Debtor's employees to provide safe care, and systematically assesses personnel adherence to correct infection prevention practices.  This committee meets on a monthly basis.

- **The Joint Commission Committee**: this committee, staffed by Kelly Vroom, the Debtor's Vice President, Patient Administrative Services, Mr. Mark, Ms. Watnem and Mr. Andrada, ensures that the institute is in compliance with TJC regulations,

and shepherds the institute through TJC accreditations.  This committee meets on a monthly basis.

- **HIPAA/Privacy Officer**:  Ms. Vroom is responsible for ensuring that protected health information is preserved and used in compliance with the Debtor's privacy policy and HIPAA.

- **Performance Improvement Committee**: this committee, staffed by Mr. Mark, Ms. Watnem and Mr. Andrada, focuses on the overall performance and quality of the institute, and works in concert with the other committees to identify areas of improvement and implement quality and safety initiatives.  This committee meets on a monthly basis.

- **Human Resources**: the Debtor's director of human resources, Kate Arnold, provides input on staffing issues and other human resources matters that relate to patient care.

- **Patient Satisfaction Committee**: this committee, staffed by Ms. Vroom, Ms. Watnem and Mr. Andrada, meets regularly to discuss trends and issues seen in the patient comment cards and changes that may need to be implemented or issues that may need to be communicated to other committees or personnel.

**2.    External Monitoring of the Debtor.**

**a.    The Joint Commission.**

165.    The Debtor is subject to accreditation by The Joint Commission (as previously defined, "TJC"), a nonprofit national accreditation organization that accredits over 19,000 health care organizations and programs in the United States.  TJC surveys (i.e., inspections) typically follow a triennial cycle, with findings made available to the public in an accreditation quality report on TJC's "Quality Check" website.  TJC surveys are unannounced, and can occur more often than triennially if TJC is made aware of changed circumstances at an accredited organization that require an updated survey

166.    TJC evaluates every aspect of the Debtor's business using national patient safety goals for ambulatory care facilities, including, but not limited to: (i) leadership standards; (ii)

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

communication among staff; (iii) communication between staff and patients; (iv) nursing care; (v) staffing effectiveness; (vi) the appearance and cleanliness of the Debtor's facilities; (vii) safety protocols, including storage of hazardous materials, disposal of hazardous waste, frequency of fire drills, and emergency evacuation plans; (viii) the cleanliness and storage of the facility's linens; (ix) food storage and preparation; and (x) the competency and qualifications of the Debtor's nurses and other clinical staff.  TJC representatives also follow several patients through their entire experience at the Debtor's facilities to ensure that patient care is actually being provided in a manner consistent with that reported to TJC by the Debtor.  A true and correct copy of TJC's published Accreditation Quality Report for the Debtor is attached to the PCO Motion as Exhibit 3.

### b. The Department of Health Services and Other Regulatory Agencies.

167.     The Debtor is also subject to frequent inspections by the State of Nevada Department of Health Services ("DHS"), which has surveyors who visit the Debtor's facilities for both certification purposes and monitoring the Debtor's compliance with state regulations.

168.     The Debtor is required under state law to self-report to DHS unusual occurrences, including unexpected deaths, the occurrence of certain infectious diseases, suspected abuse (whether mental, physical, sexual, or financial, and whether patient-to-patient abuse or by a staff member) and any credible threat to the health or safety of a patient or a staff member, such as a fire, disappearance, or serious injury.  As I understand it, DHS conducts an inspection of the Debtor if the Debtor self-reports any unusual occurrence, or if a patient or family member files a complaint or makes such a report to the Debtor.

169.     DHS recently conducted two unscheduled inspections of the Debtor, on or about September 22, 2011 and November 14, 2011, and found that the Debtor was in compliance with DHS's regulatory requirements at each inspection.

170.    The Debtor is also subject to monitoring and inspection by several other regulatory agencies, including the Centers for Medicare and Medicaid Services, and OSHA. To the best of my knowledge, the Debtor is currently in compliance with the rules and regulations of each of these agencies, and has not received a notice of delinquency or non-compliance from any regulatory agency or accreditation organization. I will ensure that the Debtor provides the U.S. Trustee with copies of any survey or accreditation reports received by the Debtor from TJC, DHS and the like and notify the U.S. Trustee of any inspections that are conducted by these entities prior to the UCSD Sale.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd day of December 2011 at Las Vegas, Nevada.

GEORGE D. PILLARI

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

134136.16